Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454
        *Attorneys for all Plaintiffs*

Rory J. Isbell, OSB # 173780
(541) 647-2930 │ rory@colw.org
CENTRAL OREGON LANDWATCH
2843 NW Lolo Dr., Ste. 200
Bend, Oregon 97703
        *Attorney for Plaintiff Central Oregon LandWatch*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **CENTRAL OREGON LANDWATCH**, an Oregon non-profit corporation; and **OREGON WILD**, an Oregon non-profit corporation; | Case No. 2:20-cv-648 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | (5 U.S.C. § 706(2)) |
| **JOHANNA KOVARIK**, in her official capacity as Paulina District Ranger; **A. SHANE JEFFRIES**, in his official capacity as Ochoco National Forest Supervisor; and the **UNITED STATES FOREST SERVICE**, a federal agency of the United States Department of Agriculture, | (Environmental Matters – National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act) |
| Defendants. | |

## NATURE OF ACTION

1.      Plaintiffs Central Oregon LandWatch and Oregon Wild ("Plaintiffs") bring this challenge under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, to the final administrative actions of Johanna Kovarik, A. Shane Jefferies, and the United States Forest Service (collectively "Forest Service" or "Defendants"). In approving the Record of Decision ("ROD") for the Black Mountain Vegetation Management Project ("Black Mountain Project" or "Project") on the Ochoco National Forest (the "Forest"), Defendants acted arbitrarily, capriciously, and contrary to the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1614, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h.

2.      The ROD, based on the analysis in a Final Environmental Impact Statement ("EIS"), authorizes management activities on approximately 16,000 acres of national forestland, including logging, prescribed burning, and restoration. The ROD also authorizes over 200 miles of roadwork activities. Plaintiffs do not challenge the majority of Project components, which primarily seek to achieve more resilient dry forest conditions throughout a 34,013-acre Project Area.

3.      However, the Project calls for management activities in riparian areas and other sensitive habitats that pose significant threats to water quality and key habitats for many species including Rocky Mountain elk and native fish. Plaintiffs attempted to resolve these issues by participating extensively in the Project's administrative process, including pre-decisional resolution meetings in which Plaintiffs tried to work with the Forest Service to protect the most sensitive areas on a unit-by-unit basis. Defendants largely rejected Plaintiffs' proposals and moved forward with a decision that is not supported by the record and contrary to NFMA and NEPA. Defendants plan to begin implementing the Project in June, 2020.

4.      In authorizing the Project, Defendants failed to (1) ensure the Project is consistent with the Ochoco Land and Resource Management Plan ("Forest Plan"), as amended by the Inland

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Native Fish Strategy ("INFISH"); and (2) take a hard look at the direct, indirect, and cumulative impacts of the Project.

5.      Plaintiffs respectfully request partial vacatur of the ROD and remand of the Final EIS to the Forest Service for a full and fair analysis of the Project's impact on water quality and riparian areas, elk, and aquatic species.

6.      Should they prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims present a federal question. A present, actual, and justiciable controversy exists between the parties. The requested relief for a declaratory judgment is proper under 28 U.S.C. § 2201, and the requested injunctive relief is proper under 28 U.S.C. § 2202.

8.      Plaintiffs exhausted their administrative remedies by submitting scoping comments, comments on the Draft EIS, and objections to the Final EIS and draft ROD. The challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendants have waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project area is located within this judicial district. The Defendants maintain an office in this District. Plaintiffs maintain offices in this District.

10.     This case is properly filed in the Pendleton Division pursuant to Local Rule 3-2 because the Project Area is located in Crook and Wheeler Counties and the Project record is located in Prineville in Crook County. A substantial part of the events or omissions giving rise to this claim occurred and the property that is subject to this action is situated in the Pendleton Division.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## PARTIES

### Plaintiffs

11.    Plaintiff CENTRAL OREGON LANDWATCH ("LandWatch") is a non-profit organization based in Bend, Oregon, with over 200 members and thousands of supporters. LandWatch's mission is to achieve a responsible, balanced approach to planning for and conserving Central Oregon's land and water resources, while recognizing the needs of future generations. LandWatch works to protect and conserve the region's ecosystems and wildlife habitats, to foster thriving, sustainable communities, and to spread the costs and benefits of growth equitably across the community as a whole.

12.    Plaintiff OREGON WILD is a non-profit organization with approximately 20,000 members and supporters throughout the State of Oregon and the Pacific Northwest. Oregon Wild is headquartered in Portland, Oregon and maintains field offices in Bend, Eugene, and Enterprise, Oregon. Oregon Wild's mission is to protect and restore Oregon's wildlands, wildlife, and waters as an enduring legacy. Oregon Wild's wilderness, old-growth forest, and clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation opportunities, and fish and wildlife habitat across Oregon.

13.    Plaintiffs' members, supporters, and staff regularly visit and enjoy the Forest, including the Project Area, and intend to do so again in the near future. The members, supporters, and staff appreciate the aesthetics of the Forest, including its waters and wildlife, and use the area to engage in recreational, scientific, and spiritual activities, such as hunting, hiking, camping, fishing, photography, watershed research, and observing wildlife.

14.    Plaintiffs have organizational interests in the proper and lawful management of the Forest. Plaintiffs, and their members, supporters, and staff have participated extensively in relevant administrative actions and have actively participated in the Project's administrative process.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—3

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

15. Plaintiffs, and their members, supporters, their staff would sustain injury to aesthetic, educational, recreational, spiritual, and scientific interests if the Project proceeds as authorized. Plaintiffs, and their members, supporters, and staff have concrete plans to return to the area where the Project is proposed. Unless this Court grants the requested relief, Plaintiffs, and their members, supporters, their staff would be adversely and irreparably harmed by the Project.

**Defendants**

16. Defendant JOHANNA KOVARIK is the Paulina District Ranger for the Forest. Ms. Kovarik is the Responsible Official for the Project, and she signed the ROD, constituting the final administrative action. As Paulina District Ranger, Ms. Kovarik has the responsibility to ensure that the Project is consistent with applicable laws and regulations. Plaintiffs bring this action against Ms. Kovarik in her official capacity.

17. Defendant A. SHANE JEFFRIES is the Forest Supervisor of the Forest. Mr. Jeffries is the Reviewing Officer for the Project who instructed Ms. Kovarik to proceed with approval of the ROD. As Forest Supervisor, Mr. Jeffries has the responsibility to ensure that the Forest is managed in accordance with applicable laws and regulations. Plaintiffs bring this action against Mr. Jeffries in his official capacity.

18. Defendant the UNITED STATES FOREST SERVICE is an agency within the United States Department of Agriculture entrusted with the management of our national forests. The Forest Service is headquartered in Washington, D.C., and it has nine regions across the country. The national forests of Oregon are in Region 6. All or a significant portion of the actions and omissions alleged in this Complaint occurred in Region 6.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

## LEGAL BACKGROUND

**National Forest Management Act**

19.     NFMA is the primary statute governing the administration of national forests. NFMA and its implementing regulations establish a two-step process for forest planning and management. 16 U.S.C. § 1604.

20.     First, NFMA requires the Forest Service to develop and implement a land and resource management plan ("forest plan") for each unit of the National Forest System. 16 U.S.C. § 1604(a). Forest plans guide natural resource management activities by setting standards and guidelines, management area goals and objectives, and monitoring requirements. Each forest plan must "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B).

21.     In 1982, the Forest Service promulgated implementing regulations that interpret NFMA's "diversity requirement." The Forest Plan at issue in this case was developed pursuant to the 1982 planning regulations, and it has not been revised under another planning regulation. Under the 1982 planning regulations, the Forest Service must manage fish and wildlife habitat "to maintain viable populations of existing native * * * vertebrate species in the planning area." 36 C.F.R. § 219.19 (2001). A "viable population" is one that has the estimated numbers and distribution of reproductive individuals to ensure its continued existence is well distributed in the planning area. *Id.*

22.     Second, once a forest plan is in place, the Forest Service develops project-level plans for "specific, on-the-ground actions," such as plans for timber harvest and recreation. 16 U.S.C. § 1604(i). Each site-specific project must be consistent with the governing forest plan. *Id.*

**National Environmental Policy Act**

23.     NEPA is our nation's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It requires federal agencies to take a "hard look" at the environmental consequences of projects before taking action.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—5

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

24.     NEPA's primary purposes are to ensure fully informed decisionmaking by the agency and to provide for public participation in the environmental analysis and decisionmaking process. 40 C.F.R. § 1500.1(b), (c).

25.     To achieve these purposes, NEPA requires every federal agency to prepare an EIS for "all major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

26.     The Council on Environmental Quality ("CEQ") promulgated regulations implementing NEPA and elaborating on the requirements of an EIS. 42 U.S.C. § 4342 (establishing CEQ); 40 C.F.R. §§ 1500–1508 (CEQ's NEPA regulations).

27.     An EIS shall "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

28.     In the EIS, the agency must "describe the environment of the area to be affected or created by the alternatives under consideration." 40 C.F.R. § 1502.15. This "baseline" is the means by which to draw comparisons between action alternatives and their respective impact on the environment.

29.     The agency must disclose and consider all direct, indirect, and cumulative impacts of a proposed action. 40 C.F.R. §§ 1502.16, 1508.25. Direct impacts are those that are caused by the action and occur at the same time and place. 40 C.F.R. § 1508.8(a). Indirect impacts are also caused by the action, but occur later in time or are farther removed in distance. 40 C.F.R. § 1508.8(b). Cumulative impacts are the impacts of the proposed action, as well as impacts from other past, present, and reasonably foreseeable future actions, both federal and non-federal. 40 C.F.R. § 1508.7.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Cumulative impacts can result from individually minor but collectively significant actions. 40 C.F.R. § 1508.7.

30.     When an agency is evaluating reasonably foreseeable significant adverse effects and there is incomplete or unavailable information, the agency must make clear that such information is lacking. 40 C.F.R. § 1502.22. "If the information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the [EIS]."

31.     The NEPA documentation must provide the decisionmaker and the public with adequate information, evidence, and analysis to fully assess the potential impacts of the proposed action before decisions are made. 40 C.F.R. §§ 1500.1(b), 1508.9. NEPA requires an agency to ensure the professional integrity, including the scientific integrity of an EIS. 40 C.F.R. § 1502.24.

32.     NEPA seeks informed decisionmaking through public participation, and NEPA's public comment procedures are at the heart of the NEPA review process. Agencies must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d). An agency must make available the EIS, comments received, and any underlying documents. 40 C.F.R. § 1506.6(f). An agency must make relevant information available to the larger audience so that it may play a role in both the decisionmaking process and the implementation of the decision.

33.     An agency must include in or attach to its EIS any documents "which substantiates any analysis fundamental to the environmental impact statement." 40 C.F.R. § 1502.18. An agency may incorporate materials into an EIS by reference to cut down on bulk without impeding the agency and public review of the action. The agency must cite and summarize the document, which must be reasonably available for inspection to interested parties within the time allowed to comment. 40 C.F.R. § 1502.21.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—7

34.     An agency must prepare a concise public record of decision. 40 C.F.R. § 1505.2. In the record of decision, the agency must identify all alternatives considered and specify the "environmentally preferable alternative." 40 C.F.R. § 1505.2(b). Additionally, the agency must identify whether it has adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if it has not, the agency must explain why not. 40 C.F.R. § 1505.2(c).

**Administrative Procedure Act**

35.     The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704. Challenges brought under NEPA and NFMA are reviewed under the APA.

36.     Upon review under the APA, a court shall "hold unlawful and set aside agency action * * * found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *." 5 U.S.C. § 706(2). Furthermore, when an agency has taken action without observance of the procedure required by law, that action will be set aside. 5 U.S.C. § 706(2)(D).

## FACTUAL BACKGROUND

**The Ochoco National Forest and Forest Plan**

37.     The Ochoco National Forest is located in the heart of Central Oregon. In the language of the Paiute Indians, "Ochoco" means "Wind in the Willows."

38.     Spanning 845,498 acres, the Forest occupies a southwestern extension of the Blue Mountain physiographic province, known as the Ochoco and Maury Mountains. Elevations range from 2,200, feet to over 7,000 feet. The Forest is characterized by park-like stands of ponderosa pine intermingled with mountain meadows often fringed with aspen. At higher elevations grow mixed conifer stands made up of Douglas fir, ponderosa pine, white fir, and western larch.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—8

39.    The Forest's diversity of vegetation, climate, and geology provides habitat for a wide array of fish and wildlife species; over 375 species of reptiles, amphibians, birds, mammals, and fish are known or expected to occur on the Forest.

40.    The Forest provides numerous opportunities for recreational pursuits including hunting, fishing, hiking, and wildlife viewing. Expenditures from these recreational pursuits—especially hunting—are an important staple of the local economies of Prineville, Mitchell, and other surrounding communities.

41.    Approved in 1989, the Forest Plan governs natural resources management and establishes management Standards and Guidelines on the Forest. Although it was intended to be revised on a ten-year cycle, or at least every 15 years, the Forest Plan has never been revised in its 30 years of existence.

42.    The Forest Plan establishes 28 management areas on the Forest. A management area is composed of lands with similar capabilities or characteristics, allocated to emphasize a particular resource or mix of resources. "General Forest" and "Riparian" are management areas on the Forest.

43.    The Forest Plan establishes goals, objectives, desired conditions, and Standards and Guidelines to guide management activities on the Forest.

44.    Standards and Guidelines state the constraints within which all practices are to be carried out in implementing the Forest Plan. The Forest Plan contains management-area-specific Standards and Guidelines. The Forest Plan also sets Forest-wide Standards and Guidelines that apply to all areas of the Forest.

*Rocky Mountain Elk*

45.    The Forest Plan provides for the protection of Rocky Mountain elk and elk habitat.

46.    The Forest Plan designates elk as a Management Indicator Species ("MIS"). MIS are species selected because their response to management actions can be used as an indicator of

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

responses of other species dependent upon similar habitat conditions. In other words, their well-being can indicate the well-being of other species that use similar habitat.

47.    Elk rely on many different habitat types for their survival, including calving grounds to give birth, open foraging areas to find food, concealed security habitat to provide hiding cover, and wallows to attract mates. Wallows are areas of low disturbance where bull (male) elk cover themselves in mud, and their own urine and feces, to attract cow (female) elk during the fall of each year.

48.    To accommodate the variety of habitats needed for these life functions, elk require a mosaic of forest maturity stages, including early, forage-producing stages, and mature stages that provide cover. Contiguity of these habitat types is essential to elk survival and population viability.

49.    Elk use of these habitats is linked to levels of human disturbance. Without the habitat being relatively free of disturbance, elk use will be diminished or negated. Primary factors that influence the quantity and quality of elk habitat are the amount of timber harvest, selection of silvicultural systems, and the extent and use of the road system. Elk populations are limited by habitat capability, which changes over time in response to vegetation manipulation and road density.

50.    Forest Plan goals include providing, maintaining, and improving habitat to maintain a viable elk population. The Forest Plan strives to provide sufficient forage, thermal cover, and security habitats to maintain healthy elk populations.

51.    The Forest Plan objective for elk is to manage habitat on the Forest to meet population management targets set by the Oregon Department of Fish and Wildlife ("ODFW"). The current population management target for elk on the Forest is 4,500, an objective that has not been met since 2007. In 2017, the elk population was estimated to be 4,100.

52.    Forest Plan Standards and Guidelines provide that the Forest Service must determine if the use of an area by a MIS, like elk, is incidental or essential habitat. If it is determined

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

to be essential habitat, the Forest Plan directs the Forest Service to protect it from adverse modification of conflicting activities, modification of activities, seasonal restriction of activities, or avoiding the area.

53.     The Forest Plan instructs the Forest Service to use a habitat capability model during project planning to determine habitat effectiveness, as affected by quality and quantity of cover and forage, and open road density. Within the "General Forest" management area, open road densities are to be below 3 miles per square mile ("mi/mi$^2$"). Forest Plan Standards and Guidelines also provide that roads must be at the lowest density which meets long-term resource needs.

54.     Forest Plan Standards and Guidelines require the Forest Service to protect the character of elk calving sites. The Forest Service must minimize disturbance from human activity during calving season, approximately May 15 to June 30.

55.     Forest Plan Standards and Guidelines require the Forest Service to protect wallows during rutting season, September 1 to October 15. Standards and Guidelines also require the Forest Service to recognize the sensitivity of wallows and the potential for management activities to adversely affect these fragile areas that require special care. The Forest Plan directs the Forest Service to plan accordingly to minimize effects on wallows.

### *Riparian Areas and Water Quality*

56.     The Forest Plan provides for the protection of riparian areas and water quality.

57.     Riparian areas on the Forest include approximately 20,240 acres along 815 miles of streams. Riparian areas include water and land adjacent to water, where plants that are dependent on a perpetual source of water occur. Riparian areas are among the most critical wildlife habitats on the Forest, and fully functional riparian areas are essential for the maintenance of viable fish populations on the Forest.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—11

58.     Forest Plan goals include the maintenance or improvement of water quality and compliance with water quality standards.

59.     Forest Plan objectives include proper management of entire watersheds at all times, with special attention given to riparian areas.

60.     The Forest Plan desired future condition for riparian areas is that 90–95 percent of the riparian areas on the Forest will be in "excellent condition" by the end of the fifth decade. The Forest Plan is in its fourth decade.

61.     Forest-wide Standards and Guidelines provide that existing temperatures in the Crooked River, John Day River, and tributaries at or above 68°F will not be increased. Temperatures at or below 66°F may not be increased more than 2°F.

62.     Forest-wide Standards and Guidelines provide that stream channel cutbanks (steep banks of a stream caused by excessive erosion) should not exceed an average of 20 percent for any given stream drainage.

63.     Forest-wide Standards and Guidelines regulate road construction and reconstruction activities in riparian areas. Roads may not be constructed through the length of a riparian area. Roads crossing a riparian area may not alter stream or groundwater flow characteristics to a degree which will impact the riparian characteristics. Existing riparian communities both upstream and downstream from stream crossings must be maintained.

64.     Within the "Riparian" management area, Standards and Guidelines provide that the Forest Service may not allow more than a 10 percent cumulative increase in stream turbidity. Short-term deviations from this standard to accommodate emergency or other legitimate activities must comply with state requirements for notification and approval.

65.     Within the "Riparian" management area, Standards and Guidelines provide that special attention is to be given to land and vegetation for approximately 100 feet from the edges of

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

all perennial streams, lakes, and other bodies of water. No management practices causing detrimental changes in water temperature or chemical composition, blockages of water courses, or deposits of sediment which seriously and adversely affect water conditions or fish habitat shall be permitted within these areas. Preferential consideration to riparian-dependent resources must be given over other resources in cases of unresolvable conflicts. The presence of potential impacts to riparian areas must be discussed in all project-level environmental documents.

66.    Within the "Riparian" management area, Standards and Guidelines provide that upper streambanks must be maintained in a stable condition along at least 80 percent of the length of a stream.

67.    Within the "Riparian" management area, Standards and Guidelines provide that 80 percent of each stream must be shaded. Where this cannot be attained, 100 percent of the potential for shade must be retained.

68.    The Forest Service adopted the Inland Native Fish Strategy ("INFISH") in 1995, which amends the forest plans of 22 forests throughout the inland west, including the Ochoco Forest Plan.

69.    INFISH is a strategy designed to reduce the risk of loss of inland native fish, like Redband trout, and reduce the potential for negative impacts to aquatic habitat. Specifically, INFISH requires the Forest Service to "maintain and restore" water quality to the degree necessary to provide stable and productive riparian and aquatic habitats.

70.    INFISH provides indicators of ecosystem health, called "Riparian Management Objectives" ("RMOs"). RMOs are quantifiable measures of stream and streamside conditions that define good fish habitat and serve as indicators against which attainment or progress toward attainment of goals will be measured. INFISH sets RMOs for the following habitat features: (1) pool frequency; (2) water temperature; (3) large woody debris; (4) bank stability; (5) lower bank angle; and

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—13

(6) width/depth ratio. Actions that reduce habitat quality, regardless of whether existing conditions are better or worse than RMOs, are inconsistent with the purpose of INFISH.

71.     RMOs are considered to be the best watershed-scale information available; the Forest Service may modify RMOs only in two scenarios: (1) after completion of a watershed analysis; or (2) in the absence of a watershed analysis, where watershed or stream-reach specific data support the change.

72.     INFISH establishes Riparian Habitat Conservation Areas ("RHCAs"). RHCAs are portions of watersheds where riparian-dependent resources receive primary emphasis and where management activities are subject to specific Standards and Guidelines. These areas include traditional riparian corridors, wetlands, intermittent streams, springs and seeps, and other areas to help maintain the integrity of the aquatic ecosystems. These areas help maintain the integrity of aquatic ecosystems by (1) influencing the delivery of coarse sediment, organic matter, and woody debris to streams, (2) providing root strength for channel stability, (3) shading the stream, and (4) protecting water quality.

73.     INFISH sets Standards and Guidelines for activities inside RHCAs. INFISH Standards and Guidelines replace existing conflicting direction described in the 22 forest plans, except where forest plan direction provides more protection for inland native fish habitat. In other words, INFISH direction supersedes forest plan direction where the provisions conflict and INFISH is more protective, and INFISH direction supplements forest plan direction where there is no conflict.

74.     INFISH Standard and Guideline TM-1 prohibits timber harvest in RHCAs except for application of silvicultural practices to acquire desired vegetation characteristics where needed to attain RMOs. Silvicultural practices must be applied in a manner that does not retard attainment of RMOs and that avoids adverse effects on inland native fish.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

75.     To "retard" means to slow the rate of recovery below the near natural rate of recovery if no additional human-caused disturbance was placed on the system. "Adverse effects" include short- or long-term direct or indirect management-related impacts of an individual or cumulative nature, such as mortality, reduced growth, or other adverse physiological changes; harassment of fish; physical disturbance of redds; reduced reproductive success; delayed or premature migration; or other behavioral changes.

**The Black Mountain Project: Overview**

76.     On December 16, 2019, Defendant Kovarik signed the final ROD for the Project. The ROD authorizes implementation of "Alternative 2A." This selected alternative authorizes the Forest Service to implement management activities on approximately 15,763 acres in the Project Area. Management activities are expected to occur over a time period of two to ten years.

77.     Management activities include three logging prescriptions: commercial thinning, noncommercial thinning, and hardwood enhancement. A total of 6,469 acres are proposed for logging.

78.     Commercial thinning would involve the selective logging of tree species (targeting grand fir, Douglas-fir, and western juniper) 7 inches up to 20.9 inches diameter at breast height ("DBH"). Felled trees would be removed from the stand and sold commercially. Alternative 2A calls for commercial thinning of 4,980 acres in the Project Area, including 423 acres within RHCAs. 195 logging units are proposed for commercial thinning, yielding a total of 17.8 million board feet.

79.     Following commercial thinning, all commercially harvested units would be noncommercially thinned (4,980 acres). An additional 1,390 acres across 60 logging units are proposed for noncommercial thinning only, meaning that they would not first be commercially thinned. The noncommercial thinning prescription would be used to reduce the amount of small trees (up to 9 inches DBH).

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—15

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

80.     Hardwood enhancement involves the removal of conifers encroaching into hardwood communities, including stands of Quaking aspen, Black cottonwood, and mountain alder. 25 units encompassing 99 acres are specifically targeted for this prescription, and hardwood enhancement also would occur in commercial and noncommercial units.

81.     Management activities include fuels treatment across 15,112 acres. In the units proposed for logging activities (6,469 acres) various fuel treatments would be used following noncommercial thinning. In these units, the felled trees and branches (called the "thinning slash" or "activity generated fuels") would be subject to one of several fuel treatments, generally intended to burn or pile the activity generated fuels.

82.     The Project also calls for reducing "naturally generated fuels" across 8,643 acres of the Project Area. 4,133 acres would be specifically targeted for prescribed burning. An additional 4,511 acres would be "conditional burn areas," meaning they would not be targeted for ignition, but fire would be allowed to enter from adjacent areas.

83.     Management activities include 202.51 total miles of roadwork.

84.     Roads that are part of the official transportation system on the Forest ("system roads") receive administrative designations regarding their "operational maintenance level" ("ML"), which refers to the degree of maintenance required for a specific road and the level of service that road provides.

85.     ML 1 roads have been placed in storage for at least one year between intermittent uses. These roads are labeled as "closed" on administrative maps. It is unlawful to drive on a road labeled as "closed" on administrative maps.

86.     On the ground, it can be difficult or impossible to determine whether a road is in fact closed, as many administratively closed roads do not have physical closure signs, barriers, or

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—16

blockages to alert members of the public to the closure and prevent motorized use. Motorized use of ML 1 roads occurs in the Project Area.

87.    ML 2 roads are open for use by high clearance vehicles. ML 3, 4, and 5 roads are available for use only by highway-legal vehicles.

88.    The Project calls for 22.6 miles of new road construction for "temporary roads." Temporary roads are constructed to facilitate commercial thinning activities, and would be "open" for commercial hauling during the life of the Project. Temporary road construction causes unavoidable short-term adverse effects.

89.    The Project calls for 23.66 miles of road reconstruction and 135.88 miles of road maintenance to facilitate logging activities. This would require temporarily opening 30.9 miles of ML 1 roads.

90.    The Project calls for 17.16 miles of road closure, that is, re-designating roads from ML 2 to ML 1. As well, 2.97 miles of road would be decommissioned (1.41 miles of ML 2 roads and 1.56 miles of ML 1 roads). The distinction between closing and decommissioning a road is that a closed road is intended to be used at some time in the future while a decommissioned road would have no future transportation use.

91.    The Project calls for a 0.24-mile segment of road to be opened, that is, re-designated from ML 1 to ML 2. This change is proposed because while the road is currently administratively closed (ML 1), it is heavily used by the public and any closure would be difficult to enforce.

92.    Management activities also include restoration, including culvert replacement; riparian protection fencing; and stream restoration. Culvert replacement is expected to cost $600,000. Riparian protection fencing is expected to cost $58,700. Stream restoration, which includes planting of hardwoods and removing riparian trees to place them in-channel to increase amounts of large woody debris, is expected to cost $770,000.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—17

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

93.     In total, restoration activities are expected to cost $3,695,010. Expected revenue from commercial logging activities is $1,494,262, or 40% of the cost of restoration activities.

94.     The Forest Service did not explain how it plans to pay for the remaining 60% of restoration activities. Culvert replacement depends on the availability of funding. Riparian protection fencing depends on the availability of funding. There is limited appropriated funding for restoration activities.

95.     The Forest Service has proposed restoration activities in the past for other projects on the Forest. Restoration activities for past and ongoing projects have taken a decade or longer to complete, if ever.

**The Black Mountain Project: Impacts to Elk**

96.     Elk and elk habitat are present in the Project Area. Implementation of the Project is likely to result in a negative trend in elk habitat conditions. The Project has the potential to adversely affect elk and elk habitat, in three principal ways.

*Roads and Road Density*

97.     The presence of roads on the landscape fragments elk habitat, and the use of roads by motorized vehicles, including off-road vehicles and log trucks, negatively impacts the movement of elk. Roads directly impact elk by increasing vulnerability to harvest from legal and illegal hunting and vehicle collisions. Another significant impact is the indirect impact caused by fragmentation of habitat. Heavily roaded areas cause displacement and avoidance, shrinking the amount of available habitat.

98.     Elk use increases proportionally as distance from roads increases. Conversely, increased road densities reduce habitat effectiveness as there are fewer undisturbed areas away from roads. Motorized use in elk habitat leads to higher stress levels and increased energetic costs that reduce productivity, and reduced local and regional populations.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—18

99. For purposes of planning and evaluating the impacts of the Project, the Forest Service stated that there are 192.62 miles of system roads in the Project Area. The table below shows road mileage by Forest Service administrative designation, according to project planning documents:

**Miles of Road by Maintenance Level**

| Operational Maintenance Level | Miles |
|---|---|
| ML 1 (Closed) | 51.54 |
| ML 2 (High Clearance Vehicles Allowed) | 119.80 |
| ML 3 (Passenger Car Allowed; Low Speed) | 16.95 |
| ML 4 (Passenger Car Accepted; Moderate Speed) | 0 |
| ML 5 (Passenger Car Encouraged; High Speed) | 4.33 |

100. The Forest Service does not have an inventory of non-system routes (*i.e.*, roads and trails used by motorized vehicles that are not specified as ML 1–5 roads, including temporary roads and trails used for past activities, and illegally created routes). These non-system routes cover an unknown potion of the Project Area and are currently in various conditions.

101. The majority of the Project Area is located in the General Forest management area. Within this management area, the Forest Plan sets an open road density standard of 3 mi/mi$^2$.

102. The Project Area is 34,013 acres, or 53.14 square miles (there are 640 acres per square mile). Accordingly, current road density of system roads (ML 1–5) in the Project Area is 3.62 mi/mi$^2$ (192.62 ÷ 53.14). This road density does not include non-system roads in the Project Area.

103. The Forest Service states that the Project Area currently has an "open" road density of 2.66 mi/mi$^2$, which equals 141.35 miles of road (2.66*53.14). The Forest Service only included ML 2–5 roads in its road density analysis.

104. The Forest Service states that the Project would reduce open road density by closing 17.16 miles of road and decommissioning of 2.97 miles of road. According to the Forest Service, open road density would be reduced to 2.31 mi/mi$^2$ as a result of Project activities. The Forest

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

Service has not provided a timetable for when road closure and decommissioning would occur. Road decommissioning is contingent on funding.

105.    The Forest Service did not account for temporary roads or re-opening of ML 1 roads for Project activities in its road density analysis.

106.    The Project calls for 23.9 miles of temporary roads. In addition, at least 30.91 miles of current ML 1 roads (closed) would be opened. Adding this increased road mileage to the current mileage of administratively open system roads yields a road density of 3.69 mi/mi$^2$ $((23.9+30.91+141.35) \div 53.14)$. Adding the increased mileage of temporary roads to the current total mileage of system roads yields a road density of 4.07 mi/mi$^2$ $((23.9+192.62) \div 53.14)$.

107.    During implementation, which typically occurs over a 10-year period when timber sales are active, log hauling activities would increase local traffic levels. Disturbance to elk is expected to increase during this time.

108.    The Forest Service did not assess any user-created trails, non-system roads, or other unauthorized routes in its road density analysis.

109.    When the Forest Plan was adopted in 1989, cross-country motorized travel—that is, travel off of open motorized roads and designated routes—was lawful. After promulgation of the Travel Management Rule in 2005 and issuance of the Travel Management Decision in 2011, motorized travel is only allowed on roads and routes specifically marked as open.

110.    "Unauthorized" motorized use, that is, use of administratively closed system roads and/or user-created routes, still occurs on the Forest. Unauthorized motorized use occurs on ML 1 (that is, administratively closed) roads, temporary roads used for past activities that were not properly closed or decommissioned, non-system roads, and other user-created trails that serve as an extension of the Forest transportation system.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—20

111.    In prior project planning documents, the Forest Service estimated there are over 700 miles of unauthorized motorized routes in a project area that comprised approximately half of the Forest (and which includes the Black Mountain Project Area). Off-highway vehicle ("OHV") use on the Forest and within the Project Area has increased in the last 10 years. ML 1 (closed) roads and other unauthorized routes receive motorized use in the Project Area.

112.    Elk can be affected by motorized use regardless of a road's administrative designation.

113.    As a foreseeable consequence of motorized disturbance on public land, elk will move to private lands with lower road densities. When road densities exceed certain thresholds, entire herd ranges may be abandoned.

*Calving and Rutting Habitat*

114.    Low-disturbance or disturbance-free elk calving and wallow habitat is important to ensure the reproductive viability of local elk populations. Elk are particularly vulnerable to disturbance during reproductive and breeding periods, including from increased noise from motorized vehicles and logging operations. Elk calving areas with low disturbance are needed for birthing to ensure population recruitment. Cow elk select sites far from roads (>541–791 meters). Likewise, bull elk required low-disturbance areas for wallows, where they cover themselves in mud laced with their urine and feces (their perfume) to attract and breed with cow elk in the fall of the year. Both life history functions (calving and reproduction) are essential to the health, productivity, and vitality of an elk herd.

115.    During project planning, the Forest Service did not identify where calving areas or wallows are located in the Project Area.

116.    Habitat suitable for calving areas is present in the Project Area. Calving and fawning primarily occur in proximity to riparian areas that provide access to high quality forage, water, and

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

cover. Aspen stands and other riparian hardwoods such as willow are likely to be attractive areas for calving and fawning. Management activities include fencing off aspen stands to restrict access by elk.

117.    Habitat suitable for wallows are present in the Project Area. Wallows primarily occur near water in proximity to riparian areas or where moist, soft ground can be found.

118.    The Project includes logging units in riparian areas, where management activities will be conducted during the calving and rutting seasons. Logging operations, including the use of heavy machinery, and roadwork and motorized use of roads, create noise levels that disturb and displace elk, inducing stress and increasing energetic costs.

119.    The Forest Service acknowledged that calving areas and wallows are likely to occur in riparian areas within the Project Area, but dismissed any obligation to inventory calving areas and wallows on grounds that the location of these areas may change from year to year. In fact, elk exhibit site fidelity and often return to the same areas each year.

120.    Instead, the Forest Service relied on post-decisional surveys. Management activities that begin during calving season (May 15 – June 30) would require surveys two-weeks prior to determine if calving elk are present. If calving elk are present, project activities would be postponed until completion of calving season. The Forest Service did not explain how it planned to locate calving elk in surveys that begin prior to the calving season. There is no restriction on management activities in calving habitat that begin before calving season.

121.    Management activities that begin during the rutting season (September 1 – October 15) would require surveys prior to implementation to determine if any wallows are present. If wallows are located, they would be flagged and no activities would be permitted within 0.25 miles of the wallow during the rutting season. The Forest Service did not explain how it planned to locate rutting elk in surveys that begin prior to the rutting season. There is no restriction on management activities in wallows that begin before rutting season.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—22

*Habitat Effectiveness*

122.    Quantity and quality of cover and open road density are the main factors influencing the effectiveness of elk habitat. It is unlikely that forage availability on the Forest is limiting elk populations.

123.    Management activities authorized by the Project would decrease habitat effectiveness. Proposed management activities, including commercial thinning and road work and use, would reduce canopy cover, decrease security habitat, and increase the potential for human disturbance.

124.    Elk avoid roaded areas in favor of areas with hiding cover. When disturbed by motor vehicles, elk will leave an area that lacks sufficient security cover. Roads and other access points lessen the amount of security habitat and increase the amount of land base subject to motorized disturbance.

125.    There are at least three ongoing and one future vegetation management projects with effects that overlap the Project Area. These projects would result in decreased cover and increased road densities in the short term. The Forest Service did not disclose the acreage of these projects, the amount of cover that would be reduced, or road densities.

**The Black Mountain Project: Impacts to Riparian Areas and Water Quality**

126.    Riparian areas are among the most critical wildlife habitats on the Forest, providing habitat for over 80% of the native fish and wildlife species. While riparian areas comprise only approximately two percent of the Forest, nearly all Forest management activities have direct or indirect effects on riparian areas and water quality.

127.    At the time of the Forest Plan's adoption, in 1989, approximately 50 percent of the total miles of streams on the Forest were in a degraded condition. The streams in poor condition had seasonal problems with turbidity and/or temperature.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—23

128.    The Forest Plan desired future condition is that 90–95 percent of the riparian areas on the Forest will be in "excellent condition" by the end of the fifth decade. Now in the Forest Plan's fourth decade, conditions have actually worsened. More than 50 percent of the total miles of streams on the Forest are in a degraded condition.

129.    The Project Area is within the Upper North Fork Crooked River watershed, which is characterized as a high desert ecoregion. Rainfall averages 20 inches, with 70 percent of the precipitation occurring between November and April.

130.    The Project Area consists of three subwatersheds: Allen Creek, Porter Creek, and Peterson Creek-North Fork Crooked River. Elevations range from 4,337 feet to 6,816 feet. Above 5,000 feet, a snowpack accumulates annually, with spring snowmelt being the primary contributor to stream flow.

131.    There are approximately 178 miles of streams in the Project Area. INFISH sets RHCA boundaries for four different categories to protect streams and waterbodies from non-channelized sediment inputs and other riparian functions. There are a total of 4,910.22 acres of RHCAs in the Project Area, representing approximately 14% of the Project Area (4,910.22 ÷ 34,013).

132.    Category 1 consists of fish-bearing streams; the RHCA consists of the 300-foot slope distance on either side of the stream (600 feet total). There are 30.6 miles of Category 1 streams in the Project Area, comprising approximately 2,019 acres of RHCAs.

133.    Category 2 consists of perennial (that is, permanently flowing), non-fish-bearing streams; the RHCA consists of the 150-foot slope distance on either side of the stream (300 feet total). There are 12.8 miles of Category 2 streams in the Project Area, comprising approximately 811 acres of RHCAs.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

134.    Category 3 consists of ponds, lakes, reservoirs, and wetlands greater than 1 acre; the RHCA consists of the 150-foot slope distance from the waterbody. There are 560.13 acres of Category 3 RHCAs in the Project Area.

135.    Category 4 consists of seasonally flowing or intermittent streams, wetlands less than 1 acre, landslides, and landslide prone areas; the RHCA consists of the 50-foot slope distance from the waterbody or area. There are a total of 134.2 miles of Category 4 streams in the Project Area, comprising approximately 1,507.4 acres of RHCAs.

136.    INFISH RHCA widths apply unless and until watershed analysis is completed to provide an ecological basis for increasing or decreasing widths to achieve riparian management goals and objectives. INFISH RHCA widths may be modified in the absence of watershed analysis only where stream reach or site-specific data support the change. In all cases, the rationale supporting RHCA widths and their effects must be documented.

137.    The Forest Plan utilizes two primary water quality parameters: temperature (as it is affected by shade) and sediment (both in transport as suspended sediment or turbidity, as well as entrained in streambed gravels). The riparian prescriptions contained in Chapter 4 of the Forest Plan contain water temperature standards and the amount of shade necessary to meet those standards, and standards to reduce or prevent stream sedimentation. INFISH sets an RMO for water temperature.

138.    The INFISH RMOs for bank stability, lower bank angle, and width/depth ratio are parameters for maintaining or restoring stream channel integrity, channel processes, and the sediment regime under which the riparian and aquatic ecosystems developed.

139.    Conditions within riparian areas in the Project Area are generally poor. Past management activities including road building, logging, stream water diversion and impoundment, grazing, and fire suppression have adversely impacted riparian areas over the last 150 years on the

Crag Law Center
3141 E Burnside St.
Portland, OR 97214
Tel. (503) 227-2212

Forest. Streams and waterbodies in the Project Area suffer from poor water quality and degraded habitat conditions, in terms of both temperature and sediment.

_Temperature and Shade_

140.    Removal of riparian shade can affect aquatic species by influencing water temperature. The amount of shading in riparian areas determines the extent streams are warmed by solar radiation. Stream shade is a key feature for maintaining low water temperatures.

141.    Stream temperatures are also influenced by factors that influence the surface area of the stream, such as a stream's width/depth ratio (_i.e._, the quotient of an equation that divides a stream's width by its depth). The reduction of pool volume and widening of stream channels increases stream temperatures.

142.    In the Project Area, Forest Plan standards and INFISH standards for stream temperature are often exceeded in the summer months. Major waterways within the Project Area are on the Oregon state list of Clean Water Act Section 303(d) impaired waters due to elevated temperatures. Stream temperatures are frequently above ranges considered suitable for persistence of cool-water aquatic species including Redband trout and Columbia spotted frog.

143.    Redband trout and Columbia spotted frog are designated as "Sensitive Species." Sensitive Species are plant or animal species which are vulnerable to habitat alteration and recognized as needing special management to avoid placement on Federal or State lists.

144.    The Forest Service did not provide any stream temperature data for Project Area streams.

145.    Most streams in the Project Area fail to meet the Forest Plan standard for shade. Out of 134 shade measurements across the three Project Area subwatersheds, only 43 met or exceeded the Forest Plan threshold for 80% shade. On account of this condition, summer water temperatures reach unsafe temperatures for fish.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—26

146.    In total, the Project calls for approximately 2,085 acres of management activities in RHCAs along 85.16 miles of streams, including 423 acres of commercial logging. Canopy removal from commercial and noncommercial logging can result in reduction of shade.

147.    INFISH sets RHCA widths that are adequate to protect streams from non-channelized sediment inputs that also should be sufficient to provide other riparian functions including stream-shading. Widths are 300 feet, 150 feet, 150 feet, and 50 feet for Category I–IV waterbodies, respectively.

148.    Rather than applying RHCA widths, the Forest Service instead focused on a 70-foot area on either side of Class I-III perennial streams which it labeled the "primary shade zone." To assess the impacts of the Project on water temperatures and stream shading from management activities in riparian areas, the Forest Service only evaluated the impacts from management activities within this so-called primary shade zone.

149.    The Forest Service devised riparian management "prescriptions" (*i.e.,* restrictions on logging activities) only for the "lowland/inner RHCA" (generally corresponding to the 70-foot, primary shade zone) of RHCAs. The Forest Service claimed there would be negligible adverse impacts to riparian shade from the Project because logging activities only would occur within 70 feet of Class I–III streams along a limited number of perennial stream miles.

150.    Logging would occur without riparian management prescriptions in the "upland/outer RHCA" (*i.e.,* more than 70 feet from the stream). The Forest Service did not evaluate the potential for shade reduction (and water temperature increases) from management activities within RHCAs but outside of the "lower/inner RHCA" area (*i.e.,* greater than 70 feet from Category I–III waterbodies). The Forest Service did not evaluate the potential for shade reduction from management activities along Category IV waterbodies at all.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—27

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

151.    INFISH sets RHCAs for all Category I–IV waterbodies, not just perennial streams. Trees further than 70 feet from waterbodies can provide stream shading.

152.    The Forest Service did not measure the Project's impacts on stream temperature from non-shade factors, such as increased width/depth ratios.

153.    The Forest Service did not quantitatively assess the Project's impacts on temperature. Temperature is both a Forest Plan Standard and INFISH RMO.

*Sediment and Turbidity*

154.    Sediment is a natural feature of aquatic ecosystems and under natural conditions gets transported through the system. Increased sediment above natural levels can cause aggradation—*i.e.*, filling—of stream beds. Aggradation results where the supply of sediment is greater than the amount of sediment the system is able to support. Aggradation leads to the filling of pools, which results in a decline in pool frequency and volume and the widening of channels, which, in turn, enlarges width/depth ratios. Reducing pool volume reduces hiding cover, and resting and feeding areas for aquatic species. Aggradation of sediment smothers fish eggs and fry (juvenile fish), increases mortality, and smothers insects, which reduces food for all life stages of fish. Fine sediment levels in excess of 20 percent trigger severe consequences for aquatic organisms.

155.    Increased sedimentation into streams increases turbidity. Turbidity (the "cloudiness" of water) is the degree to which suspended material in the water impedes light penetration and is expressed in terms of Nephlometric Turbidity Units ("NTUs"). Increased turbidity negatively impacts aquatic species. Columbia spotted frogs and other aquatic biota depend on low turbidity water for life history behaviors. Turbidity reduces growth of aquatic plants and interferes with the ability of fish and other species to catch prey. Fine particles in turbid water can clog the gills of fish like Redband trout; promote excessive algae growth; reduce dissolved oxygen; and impair visibility, increasing feeding difficulties.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—28

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

156.    Sediment can enter streams and waterbodies through both channelized and non-channelized inputs. Logging activities, roads, and other activities such as livestock grazing, can be significant sources of both channelized and non-channelized sediment inputs.

157.    Riparian logging activities, grazing, and stream crossings—that is, where roads and routes cross streams by fords or bridges, or where routes are constructed over streams by use of culverts—can impact the stability of streambanks.

158.    As a result of past logging, grazing, and roadwork, more than 50% of stream channels in the Project Area are disconnected from their floodplain and have increased sediment loads. Unstable banks are widespread, and more than 75% of channels have width/depth ratios greater than expected under near-natural conditions. Most of the sediment load in the North Fork Crooked River and tributaries comes from in-channel (channelized) inputs due to streambank instability such as channel scour, bank sloughing, cutbanks, and headcuts.

159.    Roads and logging activities also are major sources of non-channelized sediment inputs. The hydrologically connected network of roads and trails used for past logging operations in the Project Area act as extensions of the channel network, delivering large amounts of water and sediment during times of runoff. Historically, roads in the Project Area were established in the bottom of most drainages to facilitate the riparian logging operations that occurred annually on the Forest. Roads along riparian areas continue to negatively impact ecological conditions by accelerating runoff and contributing excess sedimentation over background conditions. Most stream drainages on the Forest have a road immediately adjacent to the stream.

160.    Riparian logging activities that cause ground disturbance within a certain proximity to streams, such as skid trails (the routes where logs are dragged to landings) and landings (where logs and equipment are placed and temporarily stored), contribute increased sedimentation because heavy equipment and logs displace or compact soils, causing greater surface erosion during times of

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

runoff. Soil displacement and compaction from past logging activities in the Project Area are widespread.

161.    On account of abnormal sediment delivery and degraded channel conditions, all three subwatersheds in the Project Area are rated as being in "poor" condition.

162.    The Project calls for ground disturbing activities in riparian areas, including timber felling, roadwork, and log hauling, which will lead to increases in sediment delivery to streams and waterbodies.

163.    The Forest Service estimated the amount of sediment delivery from these activities in terms of non-channelized sediment inputs. The Forest Service anticipates a short-term increase in sediment delivery of more than 50% over background levels from non-channelized sediment inputs.

164.    The Forest Service did not estimate the amount of sediment delivery in terms of channelized sediment inputs. Project management activities including riparian logging activities and construction and use of stream crossings will contribute to unstable streambank conditions. Erosion from unstable banks leads to significant increases in fine sediments.

165.    The Forest Service did not assess—quantitatively or qualitatively—the impact of the Project on stream turbidity. The Forest Service dismissed the need to measure turbidity on grounds that most of the measurable effects to aquatic life result from sediment instead of turbidity. Turbidity affects aquatic biota in different ways than fine sediment deposition. Turbidity is a Forest Plan Standard.

166.    The Forest Service did not assess the Project's impacts on lower bank angle. Lower bank angle indicates a level of bank stability and important hiding cover for fish. Lower bank angle is an INFISH RMO.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—30

**The Black Mountain Project: Administrative Process**

167.    On January 15, 2015, a Notice of Intent to prepare an EIS for the "Black Mountain Vegetation and Fuels Management Project" was published in the Federal Register. A scoping letter was sent to interested parties on January 13, 2015.

168.    Plaintiffs timely submitted scoping comments.

169.    Shortly thereafter, the Project was put on hold while Forest Service specialists focused on completing analyses for two other vegetation management and fire projects within the Forest.

170.    On April 13, 2017, the Forest Service sent interested parties an updated scoping letter and "package" of information including an updated description of the Project and maps.

171.    Plaintiffs timely submitted scoping comments. Plaintiffs expressed their general support for various aspects of the proposal, including some noncommercial thinning and restoration activities, but requested that the Forest Service reduce the scale of commercial logging and roadwork, and increase riparian restoration and road decommissioning.

172.    On December 14, 2018, the Forest Service published a 45-day public comment period for the Draft EIS in the Federal Register, and sent interested parties a letter informing them of the availability of the Draft EIS on that same day.

173.    On January 28, 2019, Plaintiffs timely submitted Draft EIS comments. Plaintiffs commented, *inter alia*, on the Project's significant impacts on water quality and riparian areas and elk. Plaintiffs questioned the need and basis for industrial logging activities and roadwork in riparian areas. Plaintiffs pointed out that the Forest Service has a long history of implementing vegetation management projects, but that the condition of most streams in the Project Area has continued to decline. Plaintiffs also expressed their support for the Forest Service's decision to retain large trees over 21 inches DBH.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—31

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

174.    On January 31, 2019, after the comment deadline had passed, the Forest Service extended the comment period for 31 days due to the lapse in federal funding and subsequent closure of the Forest offices.

175.    On February 28, 2019, Plaintiffs submitted supplemental Draft EIS comments pursuant to the new extended deadline. Plaintiffs' supplemental comments expressed additional concerns about the Project's impacts on riparian areas and water quality. Plaintiffs questioned the Forest Service's road density analysis that excluded ML 1 roads, where most of the ML 1 roads on the Forest are not in fact closed and are driven by both Forest staff and the public. Plaintiffs also flagged the inadequacy of the Draft EIS's cumulative impacts analysis.

176.    On July 19, 2019, the Forest Service sent a letter informing interested parties of the opportunity to submit pre-decisional administrative objections on the draft ROD and Final EIS during a 45-day period. The 603-page FEIS sets forth the Forest Service's proposal for approximately 16,000 acres of management activities within the Black Management Project Area and analyzes three alternatives: Alternative 1, the no action alternative; Alternative 2, the proposed action; and Alternative 3, the proposed action minus commercial thinning activities in RHCAs.

177.    Plaintiffs timely submitted objections. Plaintiffs objected *inter alia* to the Forest Service's disclosure and analysis of impacts to water quality and riparian areas and elk. Plaintiffs objected to the use of upland management treatments in riparian areas, and provided evidence showing that previous projects employing the same techniques have failed to achieve desired conditions. Plaintiffs objected to commercial logging activities within RHCAs.

178.    Along with their objections, Plaintiffs submitted expert reports from Amy Stuart, a retired ODFW fisheries biologist; Mike Gerdes, a retired Forest Service and ODFW wildlife biologist; and Jonathan Rhodes, a hydrologist with over thirty years of experience as an expert consultant.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

179.    The Forest Service hosted an "objection resolution meeting" on September 30, 2019, which was attended by representatives from Plaintiffs.

180.    The Forest Service and Plaintiffs held a follow-up meeting and exchanged correspondence in an effort to resolve objections over the Project. On October 15, 2019, Plaintiffs sent the Forest Service a letter proposing modifications to Project components and analysis. Proposed modifications to Project components suggested by Plaintiffs included protection of riparian areas by reducing management activities in RHCAs, and conducting inventories for elk calving areas and wallows. Proposed modifications to Project analysis suggested by Plaintiffs included full disclosure and analysis of Project Area road densities. Plaintiffs identified Project modifications to Project components on a unit-by-unit basis. Plaintiffs met with Forest Service representatives on October 15, 2019, during which the parties discussed Plaintiffs' proposal.

181.    On November 5, 2019, Defendant Kovarik sent a letter to Plaintiffs. The letter purported to (1) offer clarifications of some of the issues and concerns raised in the objection resolution meetings, and (2) offer modifications to the proposed selected alternative. Specifically, the Forest Service proposed dropping from the Project management activities in approximately 85 acres (out of approximately 16,000). Defendant Kovarik stated: "If the information in this letter and the modifications to the proposed decision address your objection issues, please let us know if you're willing to drop your objection."

182.    On November 17, 2019, Plaintiffs responded with a counter-proposal, stating that if accepted, Plaintiffs would not further challenge the Project. In particular, Plaintiffs proposed a modest reduction in management activities in certain RHCAs, inventories for elk calving areas and wallows that occur at biologically relevant periods, and a full and fair analysis of road density that accounts for impacts to elk.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

183.    On November 18, 2019, Defendant Jefferies provided to Plaintiffs the Forest Service's objection responses. Defendant Jeffries reiterated the changes and clarifications proposed in the November 5, 2019 letter and stated that no further changes or clarifications were merited.

184.    On December 16, 2019, Defendant Kovarik signed the final ROD for the Project. Defendant Kovarik acknowledged that no resolution was reached during the pre-decisional objection resolution process. Prior to signing the ROD, the Forest Service never responded to Plaintiffs' counter-proposal.

185.    The Forest Service's issuance of the final ROD constitutes a final agency action subject to judicial review pursuant to the APA, 5 U.S.C. § 706(2).

### FIRST CLAIM FOR RELIEF:
**(NFMA and APA Compliance)**

186.    Plaintiffs re-allege and incorporate all preceding paragraphs into each count below.

**Count One:**    **Violations of Forest Plan Standards and Guidelines Protecting Rocky Mountain Elk, a Management Indicator Species**

187.    To comply with NFMA and its implementing regulations, the Forest Service had a duty to demonstrate that the Project is consistent with the Standards and Guidelines of the Forest Plan. 16 U.S.C. § 1604(i). The Forest Plan contains Standards and Guidelines applicable to elk and elk habitat, including, but not limited to: (1) road density standards, and (2) restrictions on activities that would impact elk calving areas and wallows.

188.    The Forest Service failed to comply with Forest Plan road density standards. For example, the Forest Service failed to incorporate all functionally open roads into its analysis of road density and habitat impacts, failed to account for roads used during project implementation, and failed to offer a rational explanation for its conclusion that road density standards would not be exceeded.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

189.    The Forest Service failed to comply with Forest Plan standards protecting elk special habitats. For example, the Forest Service failed to disclose or consider the location of elk calving areas and wallows in the Project Area, substituted vague monitoring prescriptions for collection of key baseline data, failed to consider important aspects of the problem about the efficacy of monitoring, and failed to articulate a rational explanation as to how disturbance would be minimized during the critical life cycle time periods.

190.    The Forest Service failed to articulate a rational connection between the facts found and the decision made, failed to consider important aspects of the problem, offered explanations that run counter to the available evidence, and failed to observe the procedures required by law.

191.    By failing to demonstrate that the Project is consistent with Standards and Guidelines for protection of elk, the Forest Service's approval of the Project is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by NMFA and its implementing regulations, in violation of 5 U.S.C. § 706(2).

**Count Two:    Violations of INFISH and Forest Plan Standards and Guidelines Protecting Riparian Areas and Water Quality**

192.    To comply with NFMA and its implementing regulations, the Forest Service had a duty to demonstrate that the Project is consistent with the Standards and Guidelines of the Forest Plan, as amended by INFISH. 16 U.S.C. § 1604(i). INFISH sets forth Standards and Guidelines that prohibit or restrict land management activities in RHCAs that would retard or prevent attainment of RMOs or adversely affect inland native fish. Forest Plan Standards and Guidelines require the Forest Service to prioritize protections for riparian areas and ensure that temperature and sediment standards are not exceeded.

193.    The Forest Service failed to comply with INFISH Standards and Guidelines, including TM-1, which prohibits timber harvest in RHCAs unless where needed to attain RMOs. For example, the Forest Service modified RHCA widths without conducting watershed analysis or

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—35

collecting stream-reach specific data to support the change. The Forest Service failed to explain why application of upland forest prescriptions to RHCAs are needed to attain RMOs, and why application of upland forest prescriptions within RHCAs would not retard or prevent attainment of RMOs or adversely affect inland native fish. The Forest Service failed to assess the Project's impacts on the lower bank angle RMO.

194.    The Forest Service failed to comply with Forest Plan Standards and Guidelines for temperature and sediment (including shade and turbidity), and riparian roads. For example, the Forest Service addressed the potential for shade reduction from only a subset of management activities. The Forest Service authorized shade reduction at locations with less than 80% shade. The Forest Service did not quantitatively measure temperature increases. The Forest Service used an arbitrary surrogate for assessing turbidity. The Forest Service did not measure or evaluate impacts from stream crossings.

195.    The Forest Service failed to articulate a rational connection between the facts found and the decision made, failed to consider important aspects of the problem, offered explanations that run counter to the available evidence, and failed to observe the procedures required by law.

196.    Because it failed to demonstrate that the Project is consistent with the Standards and Guidelines of the Forest Plan, as amended by INFISH, for protection of riparian areas and water quality, the Forest Service's approval of the Project is arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by NMFA and its implementing regulations, in violation of 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### (NEPA and APA Compliance)

197.    Plaintiffs re-allege and incorporate all preceding paragraphs into each count below.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

**Count One:**     **The Forest Service Failed to Adequately Disclose and Consider Direct and Indirect Impacts to Elk.**

198.    An agency must consider the direct and indirect impacts of a proposed action.

40 C.F.R. §§ 1502.16, 1508.8.

199.    The Forest Service failed to consider important aspects of the problem, misapplied or ignored the best available science, and diluted its presentation of the Project's direct and indirect impacts on elk. For example, the Forest Service relied on an arbitrary and incomplete baseline for assessing the impacts of the Project on elk. The Forest Service failed to account for all roads receiving motorized use in its road density analysis. The Forest Service did not disclose impacts to elk and elk habitat over the short- and medium-term. The Forest Service did not disclose or consider the timing or efficacy of proposed restoration activities.

200.    The Forest Service failed to articulate a rational connection between the facts found and the decision made, failed to consider important aspects of the problem, offered explanations that run counter to the available evidence, and failed to observe the procedures required by law.

201.    The Forest Service's failure to adequately consider the Project's direct and indirect impacts on elk is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by NEPA, in violation of 5 U.S.C. § 706(2).

**Count Two:**     **The Forest Service Failed to Adequately Disclose and Consider Direct and Indirect Impacts to Riparian Areas and Water Quality.**

202.    An agency must consider the direct and indirect impacts of a proposed action.

40 C.F.R. §§ 1502.16, 1508.8.

203.    The Forest Service failed to consider important aspects of the problem, misapplied or ignored the best available science, and attempted to dilute the Project's direct and indirect impacts on riparian areas and water quality. For example, the Forest Service did not provide any scientific support for using a 70-foot "primary shade zone." The Forest Service did not assess, quantitatively

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

or qualitatively, the impacts to water quality from stream crossings. The Forest Service never explained why fine sediment deposition is an appropriate surrogate for turbidity. The Forest Service never explained how it could properly assess compliance with quantitative temperature standards without any data on stream temperatures. The Forest Service did not disclose or consider the timing or efficacy of proposed restoration activities.

204.    The Forest Service failed to articulate a rational connection between the facts found and the decision made, failed to consider important aspects of the problem, offered explanations that run counter to the available evidence, and failed to observe the procedures required by law.

205.    The Forest Service's failure to adequately consider the Project's direct and indirect impacts on water quality and riparian areas is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by NEPA, in violation of 5 U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF
### (NEPA and APA Compliance)

206.    Plaintiffs re-allege and incorporate all preceding paragraphs into each count below.

**Count One:**    **The Forest Service Failed to Adequately Disclose and Consider Cumulative Impacts.**

207.    An agency must consider the cumulative impacts of a proposed action, including impacts from other past, ongoing, and reasonably foreseeable future actions. 40 C.F.R. § 1508.7, 1508.25.

208.    Cumulative impacts are the sum total of individually minor but collectively significant actions taking place over a period of time.

209.    The Forest Service failed to adequately analyze the cumulative impacts of the Project on elk when combined with the impacts from past, ongoing, and future actions. For example, the Forest Service did not provide any quantified or detailed information about ongoing and reasonably

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—38

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

foreseeable projects with effects that overlap with the Black Mountain Project in space and time. The Final EIS merely lists three ongoing and one future vegetation management projects but does not provide any detail regarding the location of those projects or their acreage, the amount of cover reduction, or increase in road density. The FEIS merely states that the past, present, and reasonably foreseeable future projects have been "considered." The Forest Service failed to provide an analysis of the combined or synergistic impacts of these projects and the Project on elk.

210.    The Forest Service failed to adequately analyze the cumulative impacts of the Project on riparian areas and water quality. For example, the Forest Service did not provide any information about the effects of the existing roads in riparian areas on stream temperature and turbidity. The Forest Service exaggerated the benefits of past, present, and reasonably foreseeable future actions in the Project Area, including grazing plans, but failed to provide any quantitative or detailed information. The Forest Service failed to evaluate the impacts of the Project, combined with the impacts from past, present, and reasonably foreseeable future projects at a biologically relevant timescale for aquatic species, despite admitting that the timing of the effects from the Project will be in the range of decades.

211.    The Forest Service failed to articulate a rational connection between the facts found and the decision made, failed to consider important aspects of the problem, offered explanations that run counter to the available evidence, and failed to observe the procedures required by law.

212.    The Forest Service's failure to adequately consider cumulative impacts is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by NEPA, in violation of 5 U.S.C. § 706(2).

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—39

A.      Declare the Forest Service has violated the National Forest Management Act and its implementing regulations by authorizing a project that is inconsistent with the governing forest plan;

B.      Declare the Forest Service has violated the National Environmental Policy Act and its implementing regulations by issuing the Final EIS and ROD without satisfying its legal obligations to take a hard look at the direct, indirect, and cumulative impacts of the Black Mountain Project;

C.      Declare the Forest Service's issuance of the Final EIS and ROD is arbitrary, capricious, an abuse of discretion, not in accordance with, and/or without observance of procedure required by law under the APA, 5 U.S.C. § 706(2)(A), (D);

D.      Partially vacate the Black Mountain Project ROD and remand the Final EIS to the Forest Service for additional consideration;

E.      Issue preliminary and permanent injunctive relief prohibiting the Forest Service from authorizing implementation of the Black Mountain Project until such time as the Forest Service can demonstrate compliance with the requirements of the National Forest Management Act, the National Environmental Policy Act, and the Administrative Procedure Act;

F.      Award Plaintiffs their reasonable fees, costs, expenses and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act or other applicable statutes; and

G.      Grant such additional relief as the Court deems just and proper.

///


///


///


COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—40

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*

DATED this 20th day of April, 2020.

Respectfully submitted,

s/ Oliver J. H. Stiefel
Oliver J. H. Stiefel, OSB # 135436
(503) 227-2212 │ oliver@crag.org
Meriel L. Darzen, OSB # 113645
(503) 525-2725 │ meriel@crag.org
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
Fax: (503) 296-5454
*Attorneys for all Plaintiffs*

Rory J. Isbell, OSB # 173780
(541) 647-2930 │ rory@colw.org
CENTRAL OREGON LANDWATCH
2843 NW Lolo Dr., Ste. 200
Bend, Oregon 97703
*Attorney for Plaintiff Central Oregon LandWatch*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2212*